

U.S. Department of Justice

*United States Attorney
Eastern District of New York*

FTB/MAA
F. #2015R00524

*271 Cadman Plaza East
Brooklyn, New York 11201*

June 23, 2023

By E-mail and ECF

The Honorable Pamela K. Chen
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY  11201

      Re:    United States v. Padraig Naughton
                Criminal Docket No. 20-272 (PKC)

Dear Judge Chen:

      The government respectfully submits this letter in advance of the sentencing hearing for defendant Padraig Naughton in the above-referenced case, which is scheduled for June 27, 2023 at 2:00 p.m.  As described below, following a three-week jury trial in October 2021, the defendant was convicted of eleven felony counts arising from his participation in a years-long scheme to deprive union benefits funds of legally-required contributions owed by the defendant's employer, Navillus Tile Inc. (d/b/a Navillus Contracting) ("Navillus"), a prominent construction contractor based in New York City.

      The Presentence Investigation Report (the "PSR") prepared by the U.S. Probation Department ("Probation"), dated April 20, 2023, as amended by the Addendum to the Presentence Report (the "Addendum"), dated June 23, 2023, calculates the defendant's adjusted offense level under the U.S. Sentencing Guidelines ("U.S.S.G." or the "Guidelines") as 25.  This calculation includes, over the defendant's objection, a two-level enhancement under U.S.S.G. § 2B1.1(b)(10), because the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means.

      The government agrees with Probation that the enhancement pursuant to U.S.S.G. § 2B1.1(b)(10) is appropriate, but respectfully submits that an additional two-level leadership enhancement pursuant to U.S.S.G. § 3B1.1(c) is appropriate, because the defendant was "an organizer, leader, manager, or supervisor" in the offenses of conviction.  Accordingly, the government respectfully submits that the appropriate adjusted offense level

is 27, which, assuming a Criminal History Category of I, results in a range of imprisonment under the Guidelines of 70-87 months.

The government respectfully requests that the Court impose a sentence that is sufficient, but not greater than necessary, to serve the ends of justice. For the reasons set forth below, the government submits that such a sentence should include a term of incarceration.

I.    Factual and Procedural Background

Following a three-week jury trial before Your Honor, on October 22, 2021, the defendant, the former controller of Navillus, was convicted of all eleven counts with which he was charged in the indictment returned on July 29, 2020. (See ECF Nos. 1, 262). Specifically, the defendant was convicted of: conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349 (Count One); wire fraud, in violation of 18 U.S.C. § 1343 (Counts Two through Four); mail fraud, in violation of 18 U.S.C. § 1341 (Counts Five through Seven); conspiracy to embezzle from employee benefits funds, in violation of 18 U.S.C. § 371 (Count Eight); embezzlement from employee benefits funds, in violation of 18 U.S.C. § 664 (Count Nine); conspiracy to file false remittance reports, in violation of 18 U.S.C. § 371 (Count Ten); and the submission of false remittance reports, in violation of 18 U.S.C. § 1027 (Count Eleven). (See PSR ¶¶ 1-8, 17).

A.    Relevant Offense Background

As set forth in the PSR, during the relevant period, Navillus was one of the largest construction firms in New York City and operated primarily as a masonry and concrete subcontractor on large union construction projects. (See id. ¶ 11). Through the Building Contractors Association, Inc. (the "BCA"), an employer association, Navillus entered into certain collective bargaining agreements ("CBAs") with labor union organizations, including the Bricklayers and Allied Craft Workers Local Union No. 1; the New York City District Council of Carpenters; the Cement Masons Union; the Cement and Concrete Workers District Council; the Mason Tenders District Council; the Pointers, Cleaners and Caulkers; and the International Brotherhood of Teamsters Local 282 (collectively, the "Unions"). (See id. ¶ 12; see also Naughton PSR Objections (May 4, 2023); Gov't Response to Naughton PSR Objections (May 18, 2023)). The Unions each administered funds – including health, pension, and annuity funds – for the benefit of their respective members (the "Benefits Funds"). (See PSR ¶ 13). The Benefits Funds were subject to Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, a federal law enacted to protect employee pension and welfare benefit plans such as the Benefits Funds and their participants and beneficiaries by regulating reporting, record keeping, disclosure and other matters affecting the operation of such plans. (See id.).

Navillus, as a signatory to certain CBAs, was required to employ only union members on construction projects located in New York City and to make periodic contributions to the Benefits Funds for the union members who performed covered work on

those projects.  (See id. ¶ 14; see also Naughton PSR Objections (May 4, 2023); Gov't Response to Naughton PSR Objections (May 18, 2023)).  Navillus, however, employed both union and non-union workers to perform covered work, in violation of the CBAs to which it was a signatory.  (See PSR ¶ 14).  Under the terms of the applicable CBAs, to the extent Navillus employed non-union workers – notwithstanding that it was not permitted to do so – Navillus was required to contribute to the Benefits Funds on behalf of those non-union workers for the benefit of the Benefits Funds.  (See id.).  Pursuant to the CBAs, Navillus's required contributions to the Benefits Funds were based upon the number of hours worked by each worker.  (See id. ¶ 15).  To ensure that the Benefits Funds received Navillus's required contributions under the CBAs, Navillus was required to file periodic remittance reports with the Benefits Funds that detailed the number of hours worked by each union and non-union worker.  (See id.).

The defendant was Navillus's controller during the period of the charged conduct.  (See id. ¶ 17; see also Naughton PSR Objections (May 4, 2023); Gov't Response to Naughton PSR Objections (May 18, 2023)).  The defendant's co-defendants at trial, with whom he conspired as part of the charged conduct, were Donal O'Sullivan, the owner and President of Navillus, and Helen O'Sullivan, who worked in Navillus's payroll department.  (See PSR ¶¶ 11, 16).

### B. The Criminal Conspiracy

As set forth in the PSR, between and including 2011 and 2016, the defendant and his co-defendants conspired to execute – and executed – a scheme to evade making certain contributions that Navillus was legally required to make to the Benefits Funds under the CBAs (the "Payroll Scheme").  (See id. ¶ 21; see also Naughton PSR Objections (May 4, 2023); Gov't Response to Naughton PSR Objections (May 18, 2023)).  In furtherance of the Payroll Scheme, the defendant and his co-defendants paid certain Navillus employees (the "Designated Employees") with checks issued by DEM Consulting (d/b/a Allied) ("DEM," "Allied" or "DEM/Allied").[1]  (See PSR ¶ 22).  The Designated Employees were paid with these checks even though the Designated Employees had not performed any work for DEM/Allied and had only worked for Navillus.  (See id.).  Neither Navillus, nor DEM/Allied, made contributions to the Benefits Funds on behalf of the Designated Employees, nor submitted remittance reports to the Benefits Funds as required.  (See id.).

Navillus financed the Payroll Scheme by sending funds to DEM/Allied on a weekly basis, for years.  (See id. ¶ 23; see also Naughton PSR Objections (May 4, 2023); Gov't Response to Naughton PSR Objections (May 18, 2023)).  During the course of the scheme, the defendants sent DEM/Allied approximately $7,242,990 in Payroll Scheme funds.  (See PSR ¶ 23).  The defendants also sent to DEM/Allied payroll information for the Designated Employees, including their names, social security numbers; IRS Forms W-4; the number of hours worked for Navillus; their wage rates; and the amounts to be paid to them

---

[1] This entity is referenced in the PSR by the "Consulting Firm" pseudonym.

3

by DEM/Allied. (See id.). To conceal the criminal scheme, Georgeanne Kelly, a DEM/Allied secretary, submitted false DEM/Allied billing invoices to Navillus to fraudulently make it appear that the Payroll Scheme funds were payments for "masonry" and "consulting" work performed by DEM/Allied for Navillus. (See id.). By engaging in this scheme, the defendant and his co-defendants evaded making $1,840,873.71 in required contributions to the Benefits Funds. (See Gov't Sub. on Loss, May 23, 2023, ECF No. 360).

II.     The Guidelines Calculation

The government agrees with Probation that, pursuant to U.S.S.G. § 3D1.2(d), the defendant's crimes should be grouped for purposes of calculating the Guidelines offense level. (See Addendum ¶ 40). The government further agrees that the operative Guideline for determining the total offense level is U.S.S.G. § 2B1.1(a)(1), which provides for a base offense level of 7, and that a two-level enhancement is appropriate under U.S.S.G. § 2B1.1(b)(10) because the crimes were committed using "sophisticated means." (See id. ¶¶ 41, 43). The government also submits that, for the reasons set forth below, a further two-level leadership enhancement is appropriate pursuant to U.S.S.G. § 3B1.1(c). Moreover, for the reasons detailed in its May 23, 2023 submission, the government contends that the total amount of financial loss to the relevant Benefits Funds caused by the defendant's conduct is $1,840,873.71. (See Gov't Sub. on Loss, May 23, 2023, ECF No. 360). That financial loss amount results in a 16-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(I).

Accordingly, the government respectfully submits that the total adjusted offense level – taking into account a base offense level of 7, a two-level sophisticated means enhancement, a two-level leadership enhancement, and a 16-level financial loss enhancement – is 27.

A.     Sophisticated Means

With respect to sophisticated means, U.S.S.G. § 2B1.1(b)(10)(C) provides that "[i]f . . . the offense . . . involved sophisticated means[,] and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, increase by 2 levels." Application Note 9(B) to section 2B1.1 explains that:

> "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. . . . Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts . . . ordinarily indicates sophisticated means.

In this case, the trial evidence shows that Naughton and his co-conspirators conspired to create a new "doing-business-as" or "d/b/a" entity called "Allied" that was grafted onto Kieran Lambe's existing business, DEM, for the purpose of enabling the defendants to carry out the illegal scheme. (See Mem. & Or., Apr. 6, 2022, ECF No. 302, at 6-9). The defendant was heavily involved in this process, directing it in most important

4

respects, including taking steps to set up Allied with payroll processing services, ensuring Allied had appropriate insurance coverage (paid for by Navillus), and specifying the description of services to be fraudulently listed on Allied's invoices to Navillus so as to conceal from the auditors of the Benefits Funds the true nature of the services provided by Allied. (See id. at 6-9, 38-39). This conduct – the creation and use of Allied to shield the criminal scheme from scrutiny – falls squarely within the language of the Application Note, which describes the use of a "fictitious entit[y]" to "hid[e]" "transactions"; and the government submits that the enhancement plainly applies.

Notably, Probation agrees that "the creation and use of what was in essence a fictional business for the purpose of shielding a portion of Navillus's payroll from scrutiny fits the description of 'sophisticated means,'" such that the two-level enhancement is warranted for this defendant. (See Addendum at 1).

B.  Leadership Role

Section 3B1.1 of the Guidelines provides for a two-level enhancement for defendants who function as "an organizer, leader, manager, or supervisor in any criminal activity . . . ." U.S.S.G. § 3B1.1(c). Here, the trial evidence makes clear that the defendant played a key role in managing and supervising Kieran Lambe and Georgeanne Kelly – trial witnesses who testified regarding their prolonged roles in the Payroll Scheme – as well as other Navillus employees who worked to facilitate the illegal Allied payroll processing. With respect to Allied, as the Court observed, the defendant effectively directed the creation of the infrastructure by which the scheme was to be accomplished. See Mem. & Or., Apr. 6, 2022, ECF No. 302, at 7 ("At this early stage, Naughton exerted control over D.E.M. in various ways . . . ."). The Court also found that the evidence showed that "although [the defendant] was not part of the payroll department . . . it was [the defendant] who supervised and helped Lambe in setting up Allied to provide the payroll services to Navillus." Id. at 38 (emphasis added). Indeed, Lambe testified at trial that it was the defendant who chose the name Allied. See Tr. 1347-48.

The trial evidence shows that, after helping to set up the Allied payroll, the defendant remained involved in the Payroll Scheme, continuing to direct the administration of the Allied payroll for years, including by supervising other Navillus employees who facilitated the weekly exchange of payroll sheets from Navillus to Allied, on the one hand, and invoices from Allied to Navillus, on the other hand. See, e.g., Tr. 2096-99, 2100-01; GX 7049 (text messages between Georgeanne Kelly and Navillus employee concerning payroll invoices); GX 6002-6006, 6008 (recorded phone calls between Georgeanne Kelly and the defendant in May and June 2016). Indeed, the Court has recognized the defendant's continued supervisory role in the Payroll Scheme. See Mem & Or., Apr. 6, 2022, ECF No. 302, at 39 ("[The defendant] remained closely involved in Navillus's payroll relationship with Allied the whole time the scheme operated, either by sending weekly payroll sheets, which contained trade classifications assigned by Navillus itself, or being copied on payroll related emails to Allied."); id. at 18 ("Allied continued to renew its insurance policies at [the defendant's] direction and with his involvement in the following years." (emphasis added)).

5

Despite the defendant's efforts to minimize his criminal conduct, the key role he played in the Payroll Scheme – standing up the logistics for the Allied payroll process and then directing activities in connection with the operation of the Allied payroll during the entire period the Allied payroll was utilized in furtherance of the Payroll Scheme – cannot fairly be characterized as merely "ministerial," as the defendant suggests. See Def. Sent. Mem. at 8. The defendant acted as "an organizer, leader, manager, or supervisor," and accordingly his conduct warrants a two-level enhancement pursuant to U.S.S.G. § 3B1.1(c).[2]

C.   Total Offense Level

If the Court applies these enhancements and adopts the government's proposed loss calculation, the total adjusted offense level is 27. There is no dispute that the defendant falls within Criminal History Category I, such that the advisory range of imprisonment would be 70-87 months under the Guidelines.

If the Court instead were to adopt defendant Donal O'Sullivan's proposed loss calculation of $193,736.17, then the base offense level would still be 7 under U.S.S.G. § 2B1.1(a)(1) and 10 levels would be added pursuant to U.S.S.G. § 2B1.1(b)(1)(F) (loss greater than $150,000) for a total adjusted offense level of 17, which carries an advisory range of imprisonment of 24-30 months. If the Court applies the additional two-level sophisticated means enhancement, as recommended by both Probation and the government, and the additional two-level leadership enhancement, as recommended by the government, the total adjusted offense level would be 21, which carries an advisory range of imprisonment of 37-46 months.

---

[2]   The defendant's suggestion in his sentencing submission that the government is only seeking a leadership enhancement to offset the potential for an adverse finding on the calculation of the loss amount is entirely baseless. As defense counsel well knows, the government advised counsel during discussions prior to the issuance of the PSR that it was evaluating its position on a potential leadership enhancement and considering recommending that a lower-level (i.e., plus two levels) enhancement be applied. At defense counsel's request, the government agreed, first, to consider any information the defense wanted to present regarding the potential applicability of a leadership enhancement before determining the government's final position, and, second, to take no position with Probation prior to the issuance of the PSR in order to afford defense counsel an opportunity to make such a presentation. Defense counsel never made such a presentation, nor sought to make such a presentation. In advance of filing its objections to the PSR, the government – as a courtesy – communicated to defense counsel its position that a two-level enhancement was warranted and its intention to convey the same to Probation. Defense counsel's insinuation – particularly in the context of these discussions – that the government would advocate for a Guidelines enhancement it does not believe applies on the merits is utterly unfounded.

III.    The Appropriate Sentence

    A.    Legal Standard

As the Court is aware, the Sentencing Guidelines are advisory, rather than mandatory. See United States v. Booker, 543 U.S. 220, 258-60 (2005). However, the Supreme Court held in Booker that sentencing courts must consider the Guidelines in formulating an appropriate sentence. See id. In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of Booker:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

Gall, 552 U.S. at 49 (citation omitted). Next, a district court should:

> consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [a district court] may not presume that the Guidelines range is reasonable. [A district court] must make an individualized assessment based on the facts presented.

Id. at 49-50 (citation and footnote omitted).

    B.    Discussion

The defendant's crimes were serious, constituting a sustained and deliberate effort to deprive the Benefits Funds of monies that should have gone to help workers pay for their health insurance and retirement, among other things. The government's estimate of the total loss amount is almost $2 million. Even if the Court were to adopt the lower loss figure advanced by Donal O'Sullivan, the loss to the Benefits Funds (and their beneficiaries) is significant. The crimes were not ones of desperation undertaken to keep a struggling business afloat. They were instead crimes undertaken solely for the sake of greed.

The government acknowledges that the defendant is less culpable than his co-defendant, Donal O'Sullivan, who, as owner of the company, had a more direct stake in the illicit proceeds generated by the Payroll Scheme. Nevertheless, as discussed above, the defendant deliberately and painstakingly carried out the scheme over the course of six years, during which time he involved multiple other individuals in the criminal activity. His conduct encompassed, among other things, systematically deceiving the auditors of the Benefits Funds by repeatedly concealing from them the Allied payroll records of which the defendant was well aware. This was not a good-faith dispute about the scope of the applicable collective bargaining agreements – it was fraud.

7

In his submission, the defendant maintains his innocence, which is, of course, his right. The defendant, however, also strongly implies that the crimes the jury found he committed are unworthy of prosecution notwithstanding the considered judgment of Congress, which saw fit – including in 18 U.S.C. § 664 and 18 U.S.C. § 1027, two statutes that directly address the defendant's conduct here – to criminalize the Payroll Scheme in which the defendant and his co-conspirators engaged. This is consistent with the essence of the underlying offense conduct whereby the defendant and his co-conspirators engaged in an elaborate sabotage of the Benefits Funds' rights based on the belief that those rights were unworthy of their respect insofar as they related to the Allied payroll. The defendant has exhibited no remorse for his conduct.

Under these circumstances, the government submits that the Court should fashion a sentence that makes clear to the defendant and his co-conspirators, as well as others similarly situated in the industry, that criminal violations of these statutes carry penalties beyond the mere cost of doing business. The defendant constructed a sham business arrangement designed to conceal payroll records systematically for years for the purpose of skimming funds intended for the benefit of union workers. In doing so, the defendant committed – and was convicted by a jury of having committed – eleven federal felonies. Given the breadth and scope of the criminal conduct, the government respectfully submits that a term of incarceration is warranted.

IV.   Forfeiture and Restitution

The government is not seeking forfeiture.

Given the crimes of conviction, restitution is mandatory under the Mandatory Victims Restitution Act. The government respectfully requests that the Court include an order of restitution based on the loss amount ultimately determined by the Court and apportioned among the victim Benefits Funds according to the Court's findings.

8

Conclusion

   For the reasons above, the government respectfully requests that the Court impose a custodial sentence that is sufficient, but not greater than necessary, to serve the ends of justice.

               Respectfully submitted,

               BREON PEACE
               United States Attorney

       By: /s/ F. Turner Buford
               F. Turner Buford
               Meredith A. Arfa
               Assistant U.S. Attorneys
               (718) 254-7000

cc: Sean O'Shea, Esq. (by E-mail and ECF)
   Jodi Avergun, Esq. (by E-mail and ECF)
   U.S. Probation Officers Erica Vest and Nicole Gervase (by E-mail)
   Clerk of Court (PKC) (By E-mail and ECF)