

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

FTB/MAA
F. #2015R00524

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 28, 2023

<u>By E-mail and ECF</u>

The Honorable Pamela K. Chen
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY  11201

      Re:    United States v. Donal O'Sullivan
               <u>Criminal Docket No. 20-272 (PKC)</u>

Dear Judge Chen:

      The government respectfully submits this letter in advance of the sentencing hearing for defendant Donal O'Sullivan in the above-referenced case, which is scheduled for June 30, 2023 at 11:30 a.m.  As described below, following a three-week jury trial in October 2021, the defendant was convicted of eleven felony counts arising from his participation in a years-long scheme to deprive union benefits funds of legally-required contributions owed by the defendant's company, Navillus Tile Inc. (d/b/a Navillus Contracting) ("Navillus"), a prominent construction contractor based in New York City.

      The Presentence Investigation Report (the "PSR") prepared by the U.S. Probation Department ("Probation"), dated April 20, 2023, as amended by an Addendum dated June 27, 2023 (the "Addendum"), calculates the defendant's adjusted offense level under the U.S. Sentencing Guidelines ("U.S.S.G." or the "Guidelines") as 27.  This calculation includes a two-level enhancement under U.S.S.G. § 2B1.1(b)(10) because the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, and a four-level enhancement under U.S.S.G. § 3B1.1(a), because of the defendant's leadership role in the offense conduct.

      The government agrees with Probation that both enhancements are appropriately applied.  Accordingly, the government respectfully submits that the correct adjusted offense level is 27, which, assuming a Criminal History Category of I, results in a range of imprisonment under the Guidelines of 70-87 months.

The government respectfully requests that the Court impose a sentence that is sufficient, but not greater than necessary, to serve the ends of justice. For the reasons set forth below, the government submits that such a sentence should include a term of incarceration.

I. Factual and Procedural Background

Following a three-week jury trial before Your Honor, on October 22, 2021, the defendant – who owned and was the President of Navillus, and who controlled its overall operations – was convicted of all eleven counts with which he was charged in the indictment returned on July 29, 2020. (See ECF Nos. 1, 262; PSR ¶ 11). Specifically, the defendant was convicted of: conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349 (Count One); wire fraud, in violation of 18 U.S.C. § 1343 (Counts Two through Four); mail fraud, in violation of 18 U.S.C. § 1341 (Counts Five through Seven); conspiracy to embezzle from employee benefits funds, in violation of 18 U.S.C. § 371 (Count Eight); embezzlement from employee benefits funds, in violation of 18 U.S.C. § 664 (Count Nine); conspiracy to file false remittance reports, in violation of 18 U.S.C. § 371 (Count Ten); and the submission of false remittance reports, in violation of 18 U.S.C. § 1027 (Count Eleven). (See PSR ¶¶ 2-8).

A. Relevant Offense Background

As set forth in the PSR, during the relevant period, Navillus was one of the largest construction firms in New York City and operated primarily as a masonry and concrete subcontractor on large union construction projects. (See id. ¶ 11). Through the Building Contractors Association, Inc. (the "BCA"), an employer association, as well as on its own, Navillus entered into certain collective bargaining agreements ("CBAs") with labor union organizations, including the Bricklayers and Allied Craft Workers Local Union No. 1; the New York City District Council of Carpenters; the Cement Masons Union; the Cement and Concrete Workers District Council; the Mason Tenders District Council; the Pointers, Cleaners and Caulkers; and the International Brotherhood of Teamsters Local 282 (collectively, the "Unions"). (See id. ¶ 12; Addendum at 2). The Unions each administered funds – including health, pension, and annuity funds – for the benefit of their respective members (the "Benefits Funds"). (See PSR ¶ 13). The Benefits Funds were subject to Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, a federal law enacted to protect employee pension and welfare benefit plans such as the Benefits Funds and their participants and beneficiaries by regulating reporting, record keeping, disclosure and other matters affecting the operation of such plans. (See id.).

Navillus, as a signatory to certain CBAs, was required to employ only union members to perform work covered by the CBAs on construction projects located in New York City and to make periodic contributions to the Benefits Funds for the union members who performed covered work on those projects. (See id. ¶ 14; see also Addendum at 2). Navillus, however, employed both union and non-union workers to perform covered work, in violation of the CBAs to which it was a signatory. (See PSR ¶ 14). Under the terms of the

applicable CBAs, to the extent Navillus employed non-union workers – notwithstanding that it was not permitted to do so – Navillus was required to contribute to the Benefits Funds on behalf of those non-union workers for the benefit of the Benefits Funds. (See id.). Pursuant to the CBAs, Navillus's required contributions to the Benefits Funds were based upon the number of hours worked by each worker. (See id. ¶ 15). To ensure that the Benefits Funds received Navillus's required contributions under the CBAs, Navillus was required to file periodic remittance reports with the Benefits Funds that detailed the number of hours worked by each union and non-union worker. (See id.).

As indicated above, during the period of the charged conduct, the defendant was the owner and President of Navillus and controlled Navillus's overall operations. (See id. ¶ 11). The defendant's co-defendants at trial, with whom he conspired as part of the charged conduct, were Padraig Naughton, who was Navillus's controller, and Helen O'Sullivan, who worked in Navillus's payroll department. (See id. ¶¶ 16-17; see also Addendum at 2).

> B.  The Criminal Conspiracy

As set forth in the PSR, between and including 2011 and 2017, the defendant and his co-defendants conspired to execute – and executed – a scheme to evade making certain contributions that Navillus was legally required to make to the Benefits Funds under the CBAs (the "Payroll Scheme"). (See id. ¶ 21). In furtherance of the Payroll Scheme, the defendant and his co-defendants paid certain Navillus employees (the "Designated Employees") with checks issued by DEM Consulting (d/b/a Allied) ("DEM," "Allied" or "DEM/Allied").[1] (See id. ¶ 22). The Designated Employees were paid with these checks even though the Designated Employees had not performed any work for DEM/Allied and had only worked for Navillus. (See id.). Neither Navillus, nor DEM/Allied, made contributions to the Benefits Funds on behalf of the Designated Employees, nor submitted remittance reports to the Benefits Funds as required. (See id.).

Navillus financed the Payroll Scheme by sending funds to DEM/Allied on a weekly basis, for years. (See id. ¶ 23). During the course of the scheme, the defendants sent DEM/Allied over $7 million in Payroll Scheme funds. (See id.). The defendants also sent to DEM/Allied payroll information for the Designated Employees, including their names, social security numbers; IRS Forms W-4; the number of hours worked for Navillus; their wage rates; and the amounts to be paid to them by DEM/Allied. (See id.). To conceal the criminal scheme, Georgeanne Kelly,[2] a DEM/Allied employee, submitted false DEM/Allied billing invoices to Navillus to fraudulently make it appear that the Payroll Scheme funds were payments for "masonry" and "consulting" work performed by DEM/Allied for Navillus. (See id.). By engaging in this scheme, the defendant and his co-defendants evaded making

---

[1]  This entity is referenced in the PSR by the "Consulting Firm" pseudonym.

[2]  This individual is referenced in the PSR by the "Jane Doe" pseudonym.

3

$1,214,976.65 in required contributions to the Benefits Funds. (See Mem. & Or.; June 26, 2023; ECF No. 383, at 1).

II.     The Guidelines Calculation

The government agrees with Probation that, pursuant to U.S.S.G. § 3D1.2(d), the defendant's crimes should be grouped for purposes of calculating the Guidelines offense level. (See Addendum ¶ 40). The government further agrees that the operative Guideline for determining the total offense level is U.S.S.G. § 2B1.1(a)(1), which provides for a base offense level of 7, and that a two-level enhancement is appropriate under U.S.S.G. § 2B1.1(b)(10) because the crimes were committed using "sophisticated means" and a four-level leadership enhancement is appropriate under U.S.S.G. § 3B1.1(a). (See id. ¶¶ 41, 43, 45). Pursuant to the Court's Memorandum & Order dated June 26, 2023 (ECF No. 383), the total amount of financial loss to the relevant Benefits Funds caused by the defendant's conduct is $1,214,976.65. That financial loss amount results in a 14-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(H). (Addendum ¶ 42).

Accordingly, the government agrees with Probation that the total adjusted offense level – taking into account a base offense level of 7, a two-level sophisticated means enhancement, a four-level leadership enhancement, and a 14-level financial loss enhancement – is 27.

A.      Sophisticated Means

With respect to sophisticated means, U.S.S.G. § 2B1.1(b)(10)(C) provides that "[i]f . . . the offense . . . involved sophisticated means[,] and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, increase by 2 levels." Application Note 9(B) to section 2B1.1 explains that:

> "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. . . . Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts . . . ordinarily indicates sophisticated means.

In this case, the trial evidence shows that the defendant and his co-conspirators conspired to create a new "doing-business-as" or "d/b/a" entity called "Allied" that was grafted onto Kieran Lambe's existing business, DEM, for the purpose of enabling the defendants to carry out the Payroll Scheme. (See Mem. & Or., Apr. 6, 2022, ECF No. 302, at 6-9.) The defendant was complicit and participated directly in this process, including by directing Padraig Naughton to arrange the operation of the scheme in such a way as to shield the scheme through the use of DEM/Allied. (See id. at 32 ("[T]here was evidence that Donal O'Sullivan directed and was involved in setting up Navillus's relationship with Allied, for the specific purpose of carrying out the fraudulent scheme.").) The trial evidence makes clear that it was the defendant's idea to use DEM/Allied for this purpose, thereby directly

4

implicating him in the conduct that made the scheme "sophisticated." As the Court observed, Navillus also issued approximately 115 checks to Allied to finance the scheme, totaling approximately $2.9 million, that bore the signature of the defendant. This conduct – the creation and use of Allied to shield the criminal scheme from scrutiny – falls squarely within the language of the Application Note, which describes the use of a "fictitious entit[y]" to "hid[e]" "transactions"; and the government submits that the enhancement plainly applies.

      B.    <u>Leadership Role</u>

Section 3B1.1 of the Guidelines provides for a four-level enhancement for defendants who function as "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). As noted above, the defendant initiated the Payroll Scheme, and the evidence is clear that the others who participated – including his co-defendants; Kieran Lambe and Georgeanne Kelly; and other Navillus employees who transmitted weekly payroll sheets and collected fraudulent invoices – did so at his direction. In addition, the defendant, as the owner of Navillus, had a direct stake in the illicit proceeds generated by the Payroll Scheme, which went directly to the financial benefit of his company. While the defendant may not have been heavily involved in the day-to-day management of the Allied payroll process, the government submits that he certainly exercised "decision making authority"; "recruit[ed] . . . accomplices"; had a "right to a larger share of the fruits of the crime"; and maintained a "degree of control and authority exercised over others." <u>See</u> Application Note 4 to § 3B1.1. Under these circumstances, the government agrees with Probation that the four-level role enhancement is appropriately applied.

      C.    <u>Total Offense Level</u>

If the Court applies these enhancements, in light of the Court's June 26, 2023 order regarding the loss amount, the total adjusted offense level is 27. There is no dispute that the defendant falls within Criminal History Category I, such that the advisory range of imprisonment would be 70-87 months under the Guidelines.

III.    <u>The Appropriate Sentence</u>

      A.    <u>Legal Standard</u>

As the Court is aware, the Sentencing Guidelines are advisory, rather than mandatory. <u>See</u> <u>United States v. Booker</u>, 543 U.S. 220, 258-60 (2005). However, the Supreme Court held in <u>Booker</u> that sentencing courts must consider the Guidelines in formulating an appropriate sentence. <u>See</u> <u>id.</u> In <u>Gall v. United States</u>, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of <u>Booker</u>:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency,

>the Guidelines should be the starting point and the initial benchmark.

Gall, 552 U.S. at 49 (citation omitted). Next, a district court should:

>consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [a district court] may not presume that the Guidelines range is reasonable. [A district court] must make an individualized assessment based on the facts presented.

Id. at 49-50 (citation and footnote omitted).

### B.  Discussion

As a threshold matter, as the Court is aware, the government considers the defendant's conduct to constitute serious crimes, which caused harm to the victim Benefits Funds. The Payroll Scheme – which was implemented at the defendant's direction – constituted a sustained and deliberate effort to deprive the Benefits Funds of monies that should have gone to help workers pay for, among other things, their health insurance and retirements. The Court determined that a loss amount of approximately $1.2 million is appropriate for purposes of sentencing, which reflects a significant loss to the Benefits Funds (and their beneficiaries). Moreover, the crimes of the defendant and his co-conspirators were not ones of desperation undertaken to keep a struggling business afloat, but rather, were crimes undertaken solely for the sake of greed, for the defendant's own benefit.

Although, to his credit, the defendant in his sentencing video takes responsibility as the head of Navillus for the conduct at issue, the defendant has not demonstrated remorse for his conduct. Instead, the defendant blames the government for unfairly singling out him (and his co-defendants) for what he contends is essentially a breach-of-contract civil dispute. The defendant's attempts to minimize the seriousness and criminal nature of his conduct are unavailing given the criminal statutes (duly enacted by Congress) that criminalize the very conduct at issue here.

The defendant's approach underscores the need for a sentence that furthers both specific and general deterrence. This is not a situation involving a bona fide dispute over the terms of a particular CBA. The defendant and his co-conspirators deliberately and painstakingly hid a portion of their payroll from the Benefits Funds for the sake of avoiding contribution payments for a period of years. The trial evidence showed that when the defendants wanted to contest a claim of covered hours by the Benefits Funds, they knew how to do it. (See Gov't Opp'n to Def. Post-Trial Mot., Dec. 22, 2021, ECF No. 278, at 41-42.) Despite his claims otherwise, when the defendant set up the "weekly arrangement" with DEM/Allied – deliberately bypassing Navillus's own internal payroll department and the clearly-understood requirement to report all payroll records to the Benefits Funds – he simply was not acting in a good faith belief that his actions complied with the CBAs to

which he himself was a signatory.  (See Mem. & Or., Apr. 6, 2022, ECF No. 302, at 32).)  As the jury found, he was acting with criminal intent.

In addition, and at the risk of giving the argument more credit than it deserves, the defendant and his co-conspirators are far from the only individuals to be criminally charged on the basis of this type of fraud.  For example, in United States v. Lizza, et al., 19-CR-548 (JS) (E.D.N.Y.), two defendants were indicted in this District (almost a year prior to the return of the indictment in this case) on charges of, inter alia, embezzlement from employee benefit plans, in violation of 18 U.S.C. § 664 and making false statements in documents required by ERISA, in violation of 18 U.S.C. § 1027 – both of which are charged here.  See United States v. Lizza, 19-CR-548 (JS) (E.D.N.Y.), ECF No. 45 (Dec. 8, 2021).  As alleged in the Lizza indictment, the defendants schemed to defraud the International Brotherhood of Teamsters, Local 282 ("Local 282") benefits funds by arranging to split truck drivers' daily driving hours between one company's union payroll and a second company's non-union payroll – both companies with which defendant Lizza was involved, the latter as a partial owner and operator – in violation of the operative CBA.  Id. at ¶¶ 3-4, 7.  The first (union) company submitted remittance reports to Local 282 that did not include certain hours, such that the drivers were denied union wages and the Local 282 benefits funds were denied contributions for those hours.  See id. ¶ 8.  Notably, following Judge Seybert's decision denying Lizza's motion to dismiss, Lizza's trial is scheduled to begin in October 2023.  United States v. Lizza, 19-CR-548 (JS) (E.D.N.Y.), ECF No. 58 (Feb. 10, 2023).[3]  And, contrary to the defendant's claim, such cases are far from unprecedented.  See, e.g., United States v. Tripodi, et al., 11-CR-143 (ARR) (S-1) (E.D.N.Y.) (charging defendants with, among other things, conspiracy and a substantive violation of 18 U.S.C. § 664 based on a double-breasting scheme); United States v. LaBarbara, 129 F.3d 81 (2d Cir. 1997)

---

[3]   Moreover, the criminal case in Lizza was brought after a civil action was commenced against the union company seeking to recover unpaid contributions and other amounts due pursuant to the CBA and an order directing the company to submit remittance reports and participate in an audit.  See Gesualdi v. LR Safety Consultants & Constr. Servs., LLC, 19-CV-2404 (DRH), ECF No. 1 (Apr. 25, 2019).  Following the indictment, the civil plaintiffs amended their complaint to add Lizza and others as defendants seeking to recover amounts due under the CBA, along with damages for common law fraud and ERISA fraud.  See Gesualdi v. LR Safety Consultants & Constr. Servs., LLC, 19-CV-2404 (DRH), ECF No. 17 (Jan. 24, 2020).  The civil case subsequently was stayed pending resolution of the criminal case against Lizza.  See Gesualdi v. LR Safety Consultants & Constr. Servs., LLC, 19-CV-2404 (DRH), 2020 WL 13178037 (E.D.N.Y. Oct. 9, 2020).  This procedural history undercuts the defendant's suggestion that criminal cases involving a failure to make remittances to union benefits funds are handled civilly, rather than criminally.  See Def. Mem. at 44.

(affirming defendant's conviction for, among other things, aiding and abetting a violation of 18 U.S.C. § 664); United States v. Panepinto, 818 F. Supp. 48 (1993) (decision denying defendants' motion to dismiss and for a bill of particulars, and summarizing allegations that defendants devised a scheme to evade making contributions to union benefits funds as required under the operative CBA, and charging defendants by indictment with, inter alia, conspiring to embezzle assets of employee welfare benefits funds, in violation of 18 U.S.C. § 371; embezzling assets of employee welfare benefit funds, in violation of 18 U.S.C. § 664; and making false statements in documents required by ERISA, in violation of 18 U.S.C. § 1027); cf. United States v. Syed, et al., 13-CR-424 (S-1) (BMC) (defendant Syed charged with nine counts relating to his participation in a multi-year, multi-million dollar scheme fraud involving, among other things, fraudulent bids to obtain contracts, fraudulent wage reporting to the New York City School Construction Authority, and efforts to conceal the scheme).

The government acknowledges the existence of mitigating factors, including the defendant's long and admirable history of charitable works. The government submits, however, that, on balance, those good deeds cannot make up for the brazen, methodical, and long-running nature of the criminal scheme here, which resulted in the convictions of the defendant and two others who acted at his direction, as well as harm to the Benefits Funds. Under these circumstances, a term of incarceration is warranted.

IV. Forfeiture and Restitution

The government is not seeking forfeiture.

Given the crimes of conviction, restitution is mandatory under the Mandatory Victims Restitution Act. As directed by the Court at the sentencing hearing for defendant Padraig Naughton on June 27, 2023, the government will confer with the victim Benefits Funds and file an update with the Court on the status of any restitution claims, as well as the government's position on the proposed structure of the restitution award, by July 18, 2023.

Conclusion

        For the reasons above, the government respectfully requests that the Court impose a custodial sentence that is sufficient, but not greater than necessary, to serve the ends of justice.

                                        Respectfully submitted,

                                        BREON PEACE
                                        United States Attorney

                By:    /s/ F. Turner Buford
                          F. Turner Buford
                          Meredith A. Arfa
                          Assistant U.S. Attorneys
                          (718) 254-7000

cc:    Ilene Jaroslaw, Esq. (by E-mail and ECF)
       Michael Volpe, Esq. (by E-mail and ECF)
       U.S. Probation Officers Erica Vest (by E-mail)
       Clerk of Court (PKC) (By E-mail and ECF)